**UNITED STATES DISTRICT COURT**
**IN THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEBBIE PITTMAN, on behalf of herself and all others similarly situated, | ) | Case No. 1:25-cv-7938 |
| Plaintiffs, | ) | District Judge Jeremy C. Daniel |
| v. | ) | |
| GAVRIELI BRANDS, LLC, | ) | Magistrate Judge Maria Valdez |
| Defendant. | ) | |

**DECLARATION OF ROSS M. GREENKY**

Pursuant to 28 U.S.C. § 1746, Ross M. Greenky, declares and states as follows:

1. I am a partner with the law firm Barclay Damon LLP and counsel for Gavrieli Brands, LLC ("Defendant" or "Gavrieli") in the above-captioned matter.

2. I submit this declaration in support of Gavrieli's opposition to Plaintiff Debbie Pittman's ("Plaintiff") motion for voluntary dismissal, and in support of Gavrieli's cross-motion for attorneys' fees and costs pursuant to Fed. R. Civ. P. 54(d)(2) and 42 U.S.C. § 12205, and for sanctions against Plaintiff's counsel[1] pursuant to 28 U.S.C. § 1927 and the Court's inherent powers.

3. Gavrieli is an e-commerce business that sells designer ballet flats on its website, https://tieks.com/ (the "Website").

4. A search of Plaintiff's name on LexisNexis federal court dockets shows that she is a serial litigant who, since March 17, 2025, has filed 44 nearly identical website accessibility

[1] Plaintiff's counsel herein refers to David B. Reyes, Esq. of Equal Access Law Group PLLC.

lawsuits in this Court. A copy of the LexisNexis court docket results showing Plaintiff's federal court lawsuits is attached as **Exhibit A.**

5. A search of Plaintiff's counsel's law firm on LexisNexis federal court dockets shows that Plaintiff's counsel has filed more than 1,200 nearly identical website accessibility lawsuits in federal court since August 2024, including 765 in this Court alone, and a docket search of Plaintiff's counsel's law firm on New York State Courts Electronic Filing shows that Plaintiff's counsel has also filed hundreds of similar lawsuits in New York Supreme Court.

6. I have reviewed the court dockets on LexisNexis for the 44 actions commenced by Plaintiff's counsel on behalf of Plaintiff. Of the 44 lawsuits filed, 22 settled, 14 were voluntarily dismissed or dismissed by stipulation, 4 are active, 3 were closed with default judgments, and 1 was dismissed with sanctions imposed upon Plaintiff's counsel.

7. Upon reviewing the above-referenced court dockets on LexisNexis, I did not find any evidence to suggest that any of Plaintiff's cases have proceeded beyond the discovery phase of litigation.

8. On July 14, 2025, Plaintiff commenced this action against Gavrieli. Dkt. No. 1.

9. On October 6, 2025, Gavrieli filed an answer to Plaintiff's complaint, in which Gavrieli denied the substantive allegations and asserted, among other affirmative defenses, that "Plaintiff's claims are moot." *See* Dkt. No. 13, ¶ 80.

10. Prior to filing Gavrieli's answer to Plaintiff's complaint, specifically on September 24, 2025, Defendant's counsel sent an e-mail to Plaintiff's counsel, an excerpt from which is below:

> [M]y client's website is fully accessible – perhaps more so than any website I have seen targeted in the countless accessibility cases I have defended. My client has gone above and beyond to ensure that the website is (and will remain) accessible to all users. Attached is a recent report from

> PowerMapper, the evaluation tool upon which your firm has relied, which confirms that there are no access barriers, thereby rendering Pittman's claims moot. If it is an accessible website Pittman wants, rather than money, she already has it.

A copy of the PowerMapper Accessibility Validation Report, dated September 24, 2025, detecting no access barriers on the Website under the tested settings, is attached as **Exhibit B.**

11. In response, via e-mail on September 25, 2025, Plaintiff's counsel referred to Defendant's remediation efforts as "commendable," but maintained that Plaintiff's claims were not moot "given our different findings" from a PowerMapper Accessibility Validation Report, dated June 11, 2025, which was more than three (3) months before Defendant's report dated September 24, 2025. A copy of the PowerMapper Accessibility Validation Report provided by Plaintiff's counsel is attached as **Exhibit C.**

12. On October 2, 2025, Defendant's counsel sent another e-mail to Plaintiff's counsel, excerpts from which are below:

> You are relying upon an accessibility report dated June 11. The accessibility report I sent you (using the same evaluation tool), a copy of which is attached again for your convenience, was generated on September 24, and it unequivocally demonstrates there are no access barriers on the website.

Defendant's counsel reminded Plaintiff's counsel that "[y]ou found that my client's remediation efforts are 'commendable,'" and further inquired as follows:

> Has she bothered to visit the website since filing the lawsuit? She alleges in the Complaint that she "will visit the website again immediately upon Defendant correcting the numerous accessibility barriers on it," and that she "still wants to purchase ballet flats on the website." Did that happen and, if so, did she purchase a pair of "high-quality, stylish ballet flats" from the website? There are no access barriers preventing her from doing so, as evidenced by the most recent audit report from your own preferred website evaluation tool. If she has not completed that purchase, on what basis does she claim a real and immediate threat of future injury?

13. Later that same day of October 2, 2025, Defendant's counsel sent another e-mail to Plaintiff's counsel, which noted, among other things, that (1) PowerMapper Accessibility Validation Report dated September 24, 2025 confirms Defendant's Website "has no access barriers and is otherwise fully accessible in accordance with the WCAG"; (2) Defendant maintains a written Accessibility Policy, a Quarterly Testing Protocol, and an Accessibility Help & Feedback channel; and (3) if Plaintiff's counsel believed "there is any current, user-impacting access barrier on the website, please identify the page URL, steps to reproduce, and any assistive technology used so that Gavrieli Brands can verify and address it promptly." A copy of the October 2, 2025 e-mail is attached as **Exhibit D**.

14. On October 3, 2025, Plaintiff's counsel responded via e-mail that an audit conducted the previous day showed that accessibility barriers remained on the Website. A copy of the PowerMapper Accessibility Validation Report, dated October 2, 2025, provided by Plaintiff's counsel, is attached as **Exhibit E.**

15. In response, that same day, Defendant conducted another audit of the Website using the same settings that appeared in Plaintiff's counsel's report, the results of which again showed no access barriers on the Website. A copy of the PowerMapper Accessibility Validation Report, dated October 3, 2025, is attached as **Exhibit F.**

16. Later that same day of October 3, 2025, Defendant's counsel sent an e-mail to Plaintiff's counsel, attaching the latest report to confirm the Website did not contain any access barriers. Further, to ensure that Defendant had conducted the latest audit in accordance with Plaintiff's counsel's PowerMapper preferences, Defendant's counsel communicated with Plaintiff's counsel as follows: "What settings did you use to run the scan yesterday? Also, if you

are able to recreate those results, please send me a detailed report with expanded lines." A copy of the above-described e-mail is attached as **Exhibit G**, at pp. 9-10.

17. In the above-referenced e-mail, Defendant's counsel also inquired and otherwise stated as follows to Plaintiff's counsel:

> [W]hat is your version of "compliance with the ADA" in the context of website accessibility? Can you point me to the DOJ regulation under the ADA requiring private businesses to adhere, substantially or otherwise, to the WCAG? The guidance issued by the DOJ on "Web Accessibility and the ADA," available here [https://www.ada.gov/resources/web-guidance/], notes that businesses have "flexibility" with respect to compliance, and that existing technical standards, such as the WCAG, merely provide "helpful guidance" for businesses. In fact, the DOJ guidance explicitly states that "Businesses . . . can currently choose how they will ensure that the programs, services, and goods they provide online are accessible to people with disabilities." Ms. Pittman does not have the power to dictate a heightened standard for website accessibility, particularly when the DOJ has given Gavrieli Brands the right to "choose" the manner by which it achieves compliance with the ADA.
>
> Again, my client has gone above and beyond to ensure that the website is accessible, and both you and your client know that to be true. She should "immediately" visit the website and purchase a pair of ballet flats, as she alleged in the Complaint she would do, because there is nothing preventing her from doing so.

*See id.*

18. On October 6, 2025, Plaintiff's counsel admitted in an e-mail to Defendant's counsel that Plaintiff had not re-visited the Website in approximately five (5) months, reasoning as follows: "there is no reason for her to do so while this lawsuit is pending and while our understanding is that the website remains inaccessible. Once the website is fixed and during the remediation period, she intends to return. If you are confident the site is fully functional, I can ask her to revisit. If you are not confident, I prefer not to frustrate my client by subjecting her again to the same barriers she has already experienced." *See id.* at p. 8.

19. On October 8, 2025, Defendant's counsel sent a follow-up e-mail to Plaintiff's counsel, again requesting the specific settings Plaintiff's counsel used on PowerMapper. Defendant's counsel further inquired as to why there is "no reason" for Plaintiff to revisit the Website while the lawsuit is pending if she still wants to purchase the ballet flats, noting, again, that Defendant has provided multiple reports showing there are no access barriers.

20. The following day, October 9, 2025, Plaintiff's counsel provided the previously requested PowerMapper settings, along with another copy of the October 2 report. *See* Exhibit G, pp. 4-7; Exhibit E.

21. In response, via e-mail on October 14, 2025, Defendant's counsel provided Plaintiff's counsel with four separate PowerMapper Accessibility Validation Reports, each dated October 10, 2025, which were generated by scans from multiple devices and using a variety of settings, including the exact settings Plaintiff's counsel purportedly used (and also even more strict settings). *See* Exhibit G, pp. 2-4. These four reports, copies of which are attached as **Exhibits H-K**, detected no access barriers on the Website under the variety of tested settings.

22. Defendant's counsel also explained to Plaintiff's counsel why their October 2, 2025, report may be incorrect and noted that, if Plaintiff's counsel could recreate any results showing accessibility issues on the Website, counsel for the parties could screenshare and run PowerMapper together. Defendant's counsel also requested screenshots showing the access barriers that Plaintiff allegedly experienced when she purportedly attempted to purchase ballet flats from the Website on May 13, 2025. Finally, Defendant's counsel again requested that Plaintiff re-visit the Website. *See* Exhibit G at pp. 2-4.

23. On October 23, 2025, Defendant's counsel served Defendant's First Request for Production of Documents and First Set of Interrogatories upon Plaintiff's counsel. A copy of Defendant's First Set of Discovery Demands is attached as **Exhibit L.**

24. On November 7, 2025, after receiving no response to the October 14, 2025 e-mail, Defendant's counsel reiterated its outstanding requests. Defendant's counsel further requested concrete particulars for any alleged access barriers on the Website, including: (a) the exact URL(s); (b) steps to reproduce the barrier; (c) the assistive technology, browser, and device used; (d) the date and time the barrier was observed; and (e) a screenshot or video clip demonstrating the issue. Defendant's counsel also again inquired as to whether Plaintiff had re-visited the Website and purchased the desired ballet flats, and if she had not done so, he requested an explanation, along with the identification of any alleged access barriers. *See* Exhibit G, at pp. 1-2.

25. On November 22, 2025, Plaintiff's counsel served Plaintiff's responses to Defendant's First Set of Discovery Demands, which did not include a document production. A copy of Plaintiff's responses to Defendant's First Set of Discovery Demands is attached as **Exhibit M.**

26. On January 7, 2026, Defendant's counsel sent a discovery deficiency letter to Plaintiff's counsel, which stated, among other things, that:

> The above-referenced document requests and interrogatories sought documents and information regarding the electronic devices, physical addresses, internet networks, and IP addresses used by Plaintiff to access the Website.
>
> In response to the document requests, Plaintiff did not produce any documents, and the only information that Plaintiff provided in response to the interrogatories was that: (1) she used a personally owned Windows-based laptop with JAWS screen reader to access the Website, and (2) "she accessed the Website within the State of Illinois, but declines to disclose a specific street address." Further, Plaintiff stated that she "does not maintain records of historical IP addresses associated with any device or network,

> lacks personal knowledge of such technical data, and is therefore unable to provide the requested information after reasonable inquiry."
>
> Please be advised that electronic devices, physical addresses, internet networks, and IP addresses used by Plaintiff to access the Website are relevant to this action, specifically to establish whether, from where and from which device(s), and how often Plaintiff accessed the Website. Further, if Plaintiff is still in possession of the Windows-based laptop used to access the Website, she should easily be able to determine its IP address. Conversely, if Plaintiff is no longer in possession of the Windows-based laptop used to access the Website, Defendant requests that she provide the following information: (1) the date upon which Plaintiff no longer possessed the Windows-based laptop, (2) the reason Plaintiff no longer possesses the Windows-based laptop, (3) the current location of the Windows-based laptop, and (4) the name, phone number, and address of the individual currently in possession of the Windows-based laptop. Please note that Defendant reserves the right to conduct a forensic review and analysis of the Windows-based laptop and any other electronic device(s) used by Plaintiff in this action and in her 40 other identical lawsuits.

Defendant demanded that Plaintiff supplement her responses to its discovery demands. A copy of the discovery deficiency letter, dated January 7, 2026, is attached as **Exhibit N**.

27. On January 16, 2026, Plaintiff's counsel acknowledged receipt of the above-referenced deficiency letter and further stated as follows: "As reflected in the forthcoming supplements, Plaintiff maintains her previously asserted objections, including objections to requests seeking historical IP address information, forensic inspection of personal electronic devices." A copy of that e-mail is attached as **Exhibit O**, pp. 30-31.

28. Later the same day, Plaintiff's counsel and Defendant's counsel conferred on a telephone call in which Plaintiff's counsel confirmed their intention to provide supplemental responses the following week. *See id.* at pp. 29-30.

29. On January 28, 2026, after failing to receive the promised supplemental responses, Defendant's counsel stated as follows in an e-mail to Plaintiff's counsel:

> Do you still intend to supplement the plaintiff's discovery responses and produce the documents we requested? You previously advised that was

> going to happen last week, but we have not yet received supplemental responses or any documents.

*See id.* at pp. 27-28.

30. Two days later, on January 30, 2026, Plaintiff's counsel informed Defendant's counsel that they would respond the following week. *See id.* at p. 27.

31. On February 10, 2026, after still not receiving the promised supplemental discovery responses from Plaintiff's counsel, Defendant's counsel sent another e-mail stating, "We did not hear from you last week. Please advise." *See id.* at pp. 26-27.

32. On February 17, 2026, after still not receiving the promised supplemental discovery responses from Plaintiff's counsel, Defendant's counsel sent the following e-mail to Plaintiff's counsel:

> Following up again.
>
> We sent you a discovery deficiency letter on January 7. On January 16, you stated your intention to provide supplemental discovery responses, and on January 28, having received nothing from you, we followed up again. On January 30, you stated you would "reach out sometime next week and will circle back" regarding the discovery deficiency letter, but that never happened. On February 10, we followed up yet again, but you have not responded to that communication.
>
> To date, we have not received supplemental responses or any document production, despite your repeated promises. As you are aware, the written discovery deadline in this matter is February 27. If we do not receive supplemental responses and the requested documents by February 20, we will have no choice but to seek judicial intervention.
>
> Please be guided accordingly.

*See id.* at pp. 25-26.

33. On February 20, 2026, and only after the threat of judicial intervention, Plaintiff's counsel provided supplemental responses and yet still no documents. In that regard, despite stating that "to the extent responsive, non-privileged documents exist within Plaintiff's possession,

custody, or control, they are being produced," Plaintiff did not produce a single document. A copy of Plaintiff's Supplemental Responses to Defendant's First Set of Discovery Demands is attached as **Exhibit P.**

34. On March 9, 2026, as a supplemental response to Plaintiff's request for documents, Defendant's counsel provided Plaintiff's counsel with two additional PowerMapper Accessibility Validation Reports, dated February 18 and March 6, 2026, which continued to detect no access barriers on the Website under the tested settings. A copy of these two PowerMapper Accessibility Validation Reports and the e-mail to Plaintiff's counsel enclosing the same are attached as **Exhibits Q-R.**

35. On March 27, 2026, Defendant's counsel served a second discovery deficiency letter on Plaintiff's counsel, which stated, among other things, that Plaintiff's discovery responses remained deficient, particularly with respect to information regarding IP addresses, internet usage, and electronic devices. Specifically, Defendant's counsel stated as follows in the second discovery deficiency letter:

> The above-referenced document requests and interrogatories sought documents and information regarding the electronic devices, physical addresses, internet networks, and IP addresses used by Plaintiff to access the Website.
>
> In her supplemental response to the document requests and interrogatories, Plaintiff did not produce any documents, and the only additional information that Plaintiff provided in response was that: (1) she used a Dell Windows 10 laptop computer with JAWS screen reader installed to access the Website at home with a standard residential internet connection, and (2) she "does not maintain records of historical IP addresses and will not create documents that do not exist."
>
> Plaintiff's supplemental responses continue to imply that she cannot provide IP addresses used to access the Website because she no longer possesses the Dell Windows 10 laptop computer. If that is the case (and as requested in Defendant's initial discovery deficiency letter), then Defendant demands that Plaintiff provide the following information: (1) the date upon which she

> no longer possessed the Dell Windows 10 laptop computer, (2) the reason she no longer possesses the Dell Windows 10 laptop computer in light of her pending and/or anticipated litigation, (3) the current location of the Dell Windows 10 laptop computer, and (4) the name, phone number, and address of the individual currently in possession of the Dell Windows 10 laptop computer.
>
> Further, in her supplemental responses to these document requests, Plaintiff "objects to any request for forensic imaging, inspection, or examination of her personal device(s), as such discovery is not justified absent a showing of need and proportionality." However, Defendant undoubtedly has the right to conduct a forensic review and analysis of the Dell Windows 10 laptop computer and any other electronic device(s) used by Plaintiff in this action. These electronic devices, and in particular the Dell Windows 10 laptop computer she admittedly used to access the Website, are relevant to this action and Plaintiff's standing to maintain it, specifically to establish whether, from where and from which device(s), and how often Plaintiff accessed the Website.

Defendant's counsel further noted that if Plaintiff still possessed the Dell Windows 10 laptop computer, she should easily be able to determine its IP address and provide that IP address to Defendant. A copy of the second discovery deficiency letter, dated March 27, 2026, is attached as **Exhibit S**; *see also* Exhibit O, p. 24.

36. On April 3, 2026, Plaintiff's counsel responded to the second discovery deficiency letter, taking the position that, despite Plaintiff filing 44 website accessibility lawsuits, "Plaintiff does not maintain historical IP address records, logs, screenshots, or other records reflecting the access at issue" of the Website and "Plaintiff is not required to create documents that do not exist." Plaintiff's counsel further took the position that "Defendant's requests seeking forensic imaging, inspection, or examination of Plaintiff's personal device(s), as well as additional information regarding device disposition or location, are disproportionate, intrusive, and not warranted absent a specific showing of need." A copy of Plaintiff's counsel's letter, dated April 3, 2026, is attached as **Exhibit T.**

37. On April 7, 2026, following a meet and confer with Plaintiff's counsel regarding the ongoing discovery disputes, Defendant's counsel sent a confirmation e-mail to Plaintiff's counsel, contemporaneously documenting and summarizing what transpired during the meet and confer. *See* Exhibit O, pp. 19-20.

38. During the above-referenced telephone call, Plaintiff's counsel confirmed that he would provide Defendant's counsel with the IP address for the Dell Windows 10 laptop computer that Plaintiff used to access the Website by April 10, 2026. Defendant's counsel also reserved the right to request a forensic review of Plaintiff's laptop and/or Plaintiff's internet browsing history for the date(s) on which she allegedly accessed the Website. *See id.*

39. That same day, April 7, 2026, Plaintiff's counsel responded to Defendant's counsel's e-mail as follows:

> Plaintiff will provide the IP address associated with the Dell Windows 10 laptop used to access the Website. However, I need to confer with my client regarding what historical information, if any, is available before confirming the scope of any additional browsing history. Plaintiff can confirm that she did access the Website on the date alleged in the Complaint.

*See id.* at pp. 18-19.

40. On April 10, 2026, Plaintiff's counsel served Plaintiff's Second Supplemental Responses to Defendant's First Set of Interrogatories, in which she stated: "Plaintiff does not utilize a traditional home internet router or any other fixed internet connection. Instead, Plaintiff accessed Defendant's Website exclusively through a hotspot connection using her Dell laptop. Due to the nature of hotspot-based connections, it is commonly understood that IP addresses are dynamically assigned and may change each time the device connects to or disconnects from the hotspot network." A copy of Plaintiff's Second Supplemental Responses to

Defendant's First Set of Interrogatories is attached as **Exhibit U**, Response to Interrogatory No. 15.

41. Plaintiff's second supplemental discovery responses directly contradicted Plaintiff's previous discovery responses regarding the internet connection she used to allegedly access the Website. In her second supplemental responses to Defendant's discovery demands, Plaintiff stated that she "<u>does not utilize a traditional home internet router or any other fixed internet connection</u>. Instead, <u>Plaintiff accessed Defendant's Website exclusively through a hotspot connection</u> using her Dell laptop." *See id.* (emphasis added). Yet, two (2) months earlier in her first supplemental responses to Defendant's discovery demands dated February 20, 2026, Plaintiff stated "that <u>she accessed the website at issue using a</u> Dell Windows 10 laptop and <u>standard residential internet connection</u>." *See* Exhibit P, Response to Document Request No. 23 (emphasis added).

42. In response, via e-mail on April 13, 2026, Defendant's counsel raised concerns with Plaintiff's counsel with respect to the fact that Plaintiff had filed dozens of website accessibility lawsuits based on her alleged inability to purchase a desired product online and yet did not use a fixed internet connection to access these websites. Defendant's counsel further noted that:

> Plaintiff, who wants Defendant and the Court to believe she is an avid online shopper, claims she *exclusively* accessed Defendant's Website through a hotspot which has changing IP addresses that she did not maintain records of and cannot otherwise provide. We hope you can understand our frustration that Plaintiff is well aware of her need to preserve potentially relevant evidence in anticipation of litigation, yet she has failed to do so with no proffered explanation.

Defendant's counsel then reiterated Defendant's previous requests for information regarding the current location and possessor of the laptop at issue. *See* Exhibit O, pp. 13-14.

43. On April 16, 2026, Plaintiff's counsel confirmed that Plaintiff currently possessed the laptop but maintained that Defendant's requests for a forensic review of the laptop or information regarding her browsing history, or "other intrusive device-level inspection" was beyond the scope of Defendant's discovery demands. *See id.* at pp. 12-13.

44. The following day, Defendant's counsel stated in an e-mail that Plaintiff's counsel's position with respect to Plaintiff's laptop and a forensic review of the same constituting "new discovery demands" was "nothing more than an additional delay tactic and/or an attempt to avoid providing responsive documents and information to which Defendant is entitled," and Defendant's counsel noted that "[t]his is especially true considering Plaintiff's suspicious explanation of her inability to provide IP addresses and her failure to use fixed internet connections to shop for products in 45 website accessibility lawsuits." *See id.* at pp. 11-12.

45. Defendant's counsel also informed Plaintiff's counsel of a recent decision in a nearly identical discovery dispute in a website accessibility case, *Jimenez v. Hyatt Corp.*, 2025 U.S. Dist. LEXIS 148432 (E.D. Cal. 2025), in which the court granted the defendant's motion for sanctions and ordered the plaintiff (who, like Plaintiff here, failed to preserve evidence relating to her internet browser history, IP address(es), and related computer data) to submit her personal computer for forensic examination and to pay for that forensic examination. *See id.*

46. Nonetheless, in the interest of attempting to avoid motion practice, Defendant's counsel served Defendant's second set of discovery demands, which requested: (a) internet history on all internet browsers of Plaintiff's laptop for any dates she allegedly visited the Website; (b) URL addresses of the specific webpages Plaintiff visited on the laptop on all internet browsers of Plaintiff's laptop for any dates she allegedly visited the Website; (c) the cookies on internet browsers of Plaintiff's laptop; (d) Plaintiff's laptop for a forensic examination of relevant data; (e)

information regarding the internet browsers on Plaintiff's laptop; and (f) confirmation of whether Plaintiff deleted her internet history for the date(s) she allegedly visited the Website. Defendant's Second Set of Discovery Demands are attached as **Exhibit V.**

47. Also, that same day of April 17, 2026, Defendant's counsel requested Plaintiff's availability for a deposition between May 4 and May 29, 2026. *See* Exhibit O, pp. 11-12.

48. On April 30, 2026, Defendant's counsel followed up with Plaintiff's counsel regarding Plaintiff's deposition date availability. *See id.* at p. 11.

49. On May 1, 2026, Plaintiff's counsel sent an e-mail to Defendant's counsel, the relevant excerpt from which is below:

> With respect to the laptop and forensic inspection issues, Plaintiff likewise maintains her objections. Plaintiff has confirmed that she possesses the Dell laptop referenced in her responses and has been reminded of her continuing preservation obligations. Plaintiff does not agree to voluntarily submit her personal device for forensic examination. Defendant's new discovery requests will be reviewed and responded to in accordance with the Federal Rules and applicable deadlines. Nothing in this response should be construed as a waiver of Plaintiff's objections, including relevance, proportionality, privacy, overbreadth, and burden.
>
> We also disagree with Defendant's continued use of accusatory language regarding Plaintiff's internet use and litigation history. Plaintiff has provided the information presently available to her and will supplement further, if applicable, under Rule 26(e).

*See id.* at pp. 10-11.

50. On May 9, 2026, after receiving no response regarding Plaintiff's deposition availability, Defendant's counsel again followed up and noted, "we initially made our request for her availability over three (3) weeks ago. As a result, if we do not receive a response by May 13, we will assume that you and your client are continuing to engage in delay tactics and we will simply notice her deposition for a date unilaterally set by us and expect her to appear." *See id.* at p. 10.

51. Thereafter, on May 15, 2026, having still received no response, Defendant's counsel sent another follow-up e-mail to Plaintiff's counsel, stating:

> We asked for available deposition dates a month ago. Respectfully, it should not take a month for you to provide available deposition dates for you and your client. If we do not receive available deposition dates for you and your client by Monday, May 18, 2026 at 12:00 p.m., we will unilaterally notice her deposition.

*See id.* at p. 9.

52. That same day of May 15, 2026, and a month after Defendant's counsel requested potential deposition dates, Plaintiff's counsel finally provided three potential dates for Plaintiffs' deposition, albeit with limited hours of availability on those potential dates. *See id.* at pp. 8-9.

53. At that point, however, Defendant had still not received any documents in response to its discovery demands, and it was expecting to soon receive Plaintiff's responses to Defendant's second set of discovery demands. As a result, Defendant decided to hold off on taking Plaintiff's deposition with the hope that, in the meantime, Plaintiff would provide responsive documents or agree to a forensic review of her laptop.

54. On May 18, 2026, Plaintiff's counsel served Plaintiff's responses to Defendant's second set of discovery demands, a copy of which is attached as **Exhibit W**.

55. On May 22, 2026, after reviewing Plaintiff's responses to Defendant's second set of discovery demands, Defendant's counsel sent an e-mail to Plaintiff's counsel regarding continued deficiencies, stating as follows:

> We are disappointed by Plaintiff's responses to Defendant's second set of discovery demands, which either: (1) refuse to provide responsive documents (such as the cookies on Plaintiff's laptop or Plaintiff's laptop for forensic review), or (2) confirms that Plaintiff no longer possesses responsive documents and information, such as the URLs allegedly accessed on the Website or her laptop's internet history.

> Plaintiff maintains that she did not retain the responsive documents and information because she could not reasonably anticipate litigation at the time she allegedly accessed the Website. However, her position is disingenuous in light of the fact that Plaintiff has filed 44 website accessibility lawsuits, including 12 lawsuits filed before she allegedly visited the Website on May 13, 2025. Further, Plaintiff's position that she does not have to provide responsive documents and information because she will testify to these items at her deposition is simply incorrect. Defendant does not have to "trust" Plaintiff's testimony and is entitled to relevant and responsive documents and information. If Plaintiff claims she accessed the Website on May 13, 2025, Defendant is entitled to documents and information establishing whether this is accurate, including, but not limited to, internet history, cookies, and other laptop data that would indicate website access.
>
> It bears repeating that this exact scenario played out in *Jimenez v. Hyatt Corp*, and as previously noted, it did not end well for the plaintiff in that case. Specifically, in a website accessibility case in which the plaintiff failed to preserve internet browser history, IP address(es), and related computer data, the district court granted the defendant's motion for sanctions and ordered the plaintiff to submit her personal computer for forensic examination and to pay for such examination. 2025 U.S. Dist. LEXIS 148432 (E.D. Cal. 2025). Please note that we intend to seek similar relief from the Court in this case, and in connection with the request for sanctions, we will note the similar games you and your client played when this Court imposed sanctions in *Debbie Pittman v. Hazel and Olive, Inc.*

*See* Exhibit O, pp. 6-7.

56. Five days later, on May 27, 2026, Plaintiff's counsel responded as follows:

> As reflected in Plaintiff's responses, Plaintiff does not possess the categories of electronically stored information Defendant seeks, including historical browser artifacts, cookies, or internet history from May 2025. Plaintiff has not withheld such materials. Nor is Plaintiff obligated to create documents or data that do not exist. Defendant's repeated insinuation that Plaintiff intentionally destroyed evidence is unsupported and improper.
>
> Defendant's reliance on Jimenez is misplaced. That matter involved its own distinct factual record and specific findings by the court after motion practice and evidentiary development. No such circumstances exist here. Moreover, Plaintiff disputes Defendant's suggestion that Plaintiff's involvement in prior, unrelated ADA matters created a generalized obligation to indefinitely preserve all browser data, cookies, or forensic images of personal devices before counsel was retained in this action or before litigation concerning Defendant's Website was reasonably

> anticipated. Any preservation obligation is limited to relevant evidence within a party's possession, custody, or control once litigation is reasonably anticipated; it does not impose a retroactive duty to preserve all device-level data based solely on prior ADA litigation activity.

*See id.* at pp. 5-6.

57. That same day, May 27, 2026, Defendant's counsel met and conferred with Plaintiff's counsel via telephone regarding Plaintiff's failure to preserve historical browser artifacts, IP addresses, cookies, internet history, internet data or produce her laptop for forensic examination. *See id.* at pp. 4-5.

58. During that telephone call, Plaintiff's counsel stated that Plaintiff would testify under oath at her deposition that she accessed the Website. Defendant's counsel explained that Defendant was not obligated to "take her word" for it, and Defendant's counsel reiterated that Defendant was entitled to documents and information responsive to its discovery demands.

59. Defendant's counsel further explained that, contrary to Plaintiff's counsel's assertions, *Jimenez* was directly on point with Plaintiff's conduct in the instant case. Specifically, Defendant's counsel explained that, as was the case in *Jimenez*: (a) Plaintiff failed to preserve dispositive evidence stored on the computer she used to access the Website, including data reflecting the URL addresses of the specific webpages she visited and her IP address and related computer data that is directly at issue in this case; (b) Plaintiff claimed that her internet history was automatically and inadvertently deleted due to her laptop's automatic deletion of the same; and (c) Plaintiff's filing of dozens of other website accessibility lawsuits placed her on notice of her duty to preserve this data. Defendant's counsel also reminded Plaintiff's counsel that, in *Jimenez*, the court ordered a forensic review of the laptop and for plaintiff to pay for the same, and Defendant's counsel further cautioned Plaintiff's counsel that Defendant would seek the same relief in addition to legal fees if forced to seek judicial intervention.

60. In response, Plaintiff's counsel confirmed that he would confer with his client to reevaluate the data to which she had access and whether she would agree to a forensic review of her laptop to account for deleted or missing data.

61. On June 11, 2026, after not receiving a substantive response from Plaintiff's counsel, Defendant's counsel sent the following e-mail:

> It has [now] been over two (2) weeks since our last meet and confer call regarding Plaintiff's laptop. Not to mention that we have been conferring on this discovery dispute for months. While we appreciate that Plaintiff has continued to evaluate the issues regarding her laptop, we need to move this forward in light of the July 15, 2026 fact discovery deadline, especially if Defendant needs to pursue motion practice. As a result, please provide us with any additional responsive documents and information by close of business tomorrow.

*See id.* at p. 3.

62. The same day, June 11, 2026, Plaintiff's counsel responded to the above-referenced e-mail, but did not provide any additional information other than to state, "Plaintiff has been consulting with and interviewing qualified forensic metadata experts regarding the issues raised in your correspondence and the information currently available. That process remains ongoing and is being undertaken in good faith."

63. On June 17, 2026, Defendant's counsel responded to Plaintiff's counsel as follows:

> We have been beyond patient.
>
> I encourage you to review the entire e-mail string below, which we intend to share with the Court if forced to proceed with a motion to compel. It has been more than two months and yet we still have no answers with respect to Plaintiff's laptop, let alone any documents or information responsive to our discovery demands. Instead, we have received flip-flopping positions, multiple excuses, and obvious delay tactics, rather than substantive responses to the discovery issues at hand.
>
> By close of business on Friday, please provide the names of the experts with whom Plaintiff has been consulting, the dates upon which she consulted with those experts, and the anticipated date by which (a) an expert will be

> retained and (b) that expert will complete the forensic review. Defendant also reserves the right to conduct its own forensic examination of Plaintiff's laptop.
>
> Please again be guided by the decisions in *Jimenez v. Hyatt Corp.*, 2025 U.S. Dist. LEXIS 148432 (E.D. Cal. 2025) and *Pittman v. Hazel and Olive, Inc.*, Case No. 25-cv-7791, at Dkt. No. 49 (N.D. Ill. March 19, 2026).

*See id.* at p. 1.

64. The next day, June 18, 2026, Plaintiff's counsel called Defendant's counsel to inquire as to whether Defendant would consent to a stipulated dismissal of this action, and shortly thereafter, Plaintiff's counsel sent Defendant's counsel a draft of the proposed stipulation of dismissal.

65. In response, on July 3, 2026, Defendant proposed its own version of a stipulated dismissal, which was conditioned upon Plaintiff agreeing to certain other terms.

66. On July 6, 2026, Defendant served a deposition notice on Plaintiff's counsel, seeking to conduct an in-person deposition of Plaintiff on July 14, 2026, which was the day before the fact discovery deadline. A copy of that deposition notice is attached as **Exhibit X.**

67. Plaintiff's counsel did not respond to Defendant's proposed stipulation of dismissal or deposition notice, and instead, Plaintiff filed a motion for voluntary dismissal. *See* Dkt. No. 32.

68. Despite Defendant's counsel's repeated requests, Plaintiff's counsel never provided any updated PowerMapper (or other) reports conducted after October 2, 2025, nor did Plaintiff's counsel ever confirm whether Plaintiff had re-visited the Website. Instead, Plaintiff's counsel continued to insist that the Website was not accessible based on their "ADA web consultants," who were never identified and who never provided any documentation to Defendant.

69. In fact, to date, Plaintiff has failed to produce a single document in response to Defendant's discovery demands, which has been the source of a discovery dispute between the

parties, as has Plaintiff's failure to produce any evidence of: (a) the IP address(es) used to access the Website on May 13, 2025; (b) the specific URL(s) on the Website she accessed; or (c) her internet history, cookies, cache, or other data showing that she actually visited the Website and/or encountered the barriers alleged.

70. Now, more than nine (9) months after Defendant's counsel first provided evidence to Plaintiff's counsel demonstrating that the Website is fully accessible, and only after forcing Defendant to incur substantial legal fees in connection with discovery and related disputes which remain unresolved and which would have been the subject of a motion to compel, Plaintiff's counsel, on essentially the eve of the discovery deadline, filed a motion for voluntary dismissal on the grounds that "the injunctive relief sought in this action is no longer necessary" based on "Plaintiff's continued investigation and evaluation during the course of this litigation," namely "Defendant's subsequent remediation of the barriers" on its Website.

71. Since September 24, 2025, Defendant has incurred approximately $31,000 in legal fees and costs to defend this action, including in connection with discovery and related disputes which remain unresolved. Defendant seeks reimbursement of those legal fees as well as the legal fees incurred in responding to Plaintiff's instant motion and filing the instant cross-motion.

For these reasons and those set forth in Gavrieli's accompanying memorandum of law, I respectfully request that the Court issue an Order: (a) dismissing the Complaint with prejudice, (b) granting the instant cross-motion for attorneys' fees and sanctions, and (c) granting Gavrieli leave to file a supplemental petition seeking recovery of its reasonable attorneys' fees incurred in this action, including reasonable attorneys' fees incurred in responding to Plaintiff's instant motion and filing the instant cross-motion, together with such other and further relief as the Court deems just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

**Dated**: July 17, 2026

*/s/ Ross M. Greenky*

Ross M. Greenky